**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MARYLAND**

| | |
|---|---|
| NATIONAL SHOOTING SPORTS FOUNDATION, INC.<br>6 Corporate Dr, Suite 650<br>Shelton, CT 06484<br><br>GLOCK, INC.<br>6000 Highlands Parkway SE<br>Smyrna, GA 30082<br><br>SHADOW SYSTEMS LLC<br>1001 Los Rios Blvd, Suite 100<br>Plano, TX 75074<br><br>STURM, RUGER & CO., INC.<br>440 Wheelers Farms Road suite 301<br>Milford, CT 06461<br><br>SOUTH DERYA CORPORATION d/b/a DERYA USA<br>1926 Spearing Street<br>Jacksonville, FL 32206<br><br>PALMETTO STATE ARMORY, LLC<br>3850 Fernandina Rd<br>Columbia, SC 29210<br><br>FRED'S SPORTS & FURNITURE, INC. d/b/a FRED'S OUTDOORS<br>2895 Crain Hwy<br>Waldorf, MD 20601<br><br>Plaintiffs,<br><br>v.<br><br>ANTHONY G. BROWN, in his official capacity as Attorney General of Maryland<br>200 St. Paul Place<br>Baltimore, MD 21202<br><br>MICHAEL A. JACKSON, in his official capacity as Secretary of the Maryland Department of State Police<br>201 Reisterstown Road<br>Pikesville, MD 21208<br><br>Defendants. | Civil Action No.______________<br><br>November 20, 2026 |

## VERIFIED COMPLAINT

The National Shooting Sports Foundation, Inc. ("NSSF"), Glock, Inc. ("Glock"), Shadow Systems LLC ("Shadow Systems"), Sturm, Ruger & Co., Inc. ("Ruger"), South Derya Corporation d/b/a Derya USA ("Derya"), Palmetto State Armory, LLC ("PSA"), and Fred's Sports & Furniture, Inc. d/b/a Fred's Outdoors (collectively, "Plaintiffs") bring this civil action seeking declaratory and injunctive relief against the Attorney General of Maryland and the Secretary of the Maryland Department of State Police.

## INTRODUCTION

1. Semiautomatic handguns "are, in fact, 'the quintessential self-defense weapon.'" *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 47 (2022) (quoting *District of Columbia v. Heller*, 554 U.S. 570, 629 (2008)). And semiautomatic handguns equipped with cruciform trigger bars are, in fact, the quintessential handgun. Pioneered by Austrian inventor Gaston Glock in the 1980s, the cruciform-trigger design revolutionized the handgun market on both sides of the Atlantic: By integrating multiple firearm components into a single part, the cruciform-trigger design resulted in a handgun that is less expensive to produce, easier to maintain, less susceptible to component failure or debris infiltration, and—critically—less likely to accidentally discharge. *See* Elwood Shelton, *Best Concealed Carry Guns in 2026 [Field Tested]*, Gun Digest (May 22, 2026), https://perma.cc/39AJ-W396 (describing cruciform-trigger handguns as "almost boringly reliable" "thanks to a painfully simplistic design that offers few opportunities for malfunctions to occur"). That explains why plaintiff Glock has for decades continued to produce millions of handguns with that design, and why manufacturers like plaintiffs Shadow Systems, Ruger, Derya, and PSA began producing and selling their own cruciform-trigger handguns using the same basic design once Glock's patents expired. It also explains why, for retailers like plaintiff Fred's

Outdoors, selling cruciform-trigger handguns to law-abiding citizens is big business: Every year, hundreds of thousands of these common arms are made in the United States and sold not just to law-abiding civilians seeking to use them for self-defense, but also to all manner of law enforcement officers in Maryland and beyond.

2. Although they are overwhelmingly used for lawful purposes, these handguns may, like "virtually any semiautomatic weapon," unlawfully "be converted … by internal modification … into a machinegun" capable of full-automatic functionality—i.e., continuously firing rounds for as long as the trigger is actuated, instead of the standard one round per trigger pull. *Staples v. United States*, 511 U.S. 600, 615 (1994). That has understandably led the federal government and many states, including Maryland, to criminalize possession of handguns that have been modified in that manner, as well as the aftermarket conversion devices—commonly known as pistol "switches"—that criminals use to accomplish the modification. But despite the omnipresent potential for illegal modification to an automatic firearm, the Supreme Court has been unequivocal that the underlying semiautomatic firearms remain "lawful" to "possess[]." *Id.* at 612. That is because "the Second Amendment protects the possession and use of weapons that are 'in common use at the time,'" full stop. *Bruen*, 597 U.S. at 21. Efforts to ban "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose"—such as cruciform-trigger handguns—thus "[f]ail constitutional muster" under "any" "standard." *Heller*, 554 U.S. at 628-29.

3. A new Maryland law flouts those principles and precedents. Starting January 1, 2027, Maryland Senate Bill 334 ("SB334") makes it a felony to sell any of the market-leading cruciform-trigger handguns. Never mind if law-abiding Maryland residents with a concealed-carry permit want to buy one of *Gun Digest*'s best concealed-carry guns of 2026. *See* Shelton,

*supra*. Never mind if law-abiding Maryland residents seeking to engage in recreational target shooting want to buy one of the top five best-selling handguns. *See* PSA, *Top 5 Best-Selling Handguns of 2026 (So Far)*, https://perma.cc/2N35-4GB2 (describing cruciform-trigger handguns as "prolific," "unsurpassed," and "the perfect balance of precision and reliability"). Never mind that, last year alone, sales of cruciform-trigger handguns generated tens of millions of dollars in revenue for manufacturers like Glock, Shadow Systems, Ruger, Derya, and PSA, retailers like Fred's Outdoors, and other NSSF members. After January 1, 2027, Maryland retailers must remove all new cruciform-trigger handguns from their shelves or subject their principals to three years in prison, unless and until manufacturers fundamentally change a design that law-abiding citizens overwhelmingly prefer for its safety, reliability, and accessibility.

4. That law lacks any historical analogue—and the logic underlying it lacks any limit. If Maryland can ban cruciform-trigger handguns because of the risk that criminals can convert them into fully automatic machine guns, then it could ban "virtually any semiautomatic weapon" for the same reason, *Staples*, 511 U.S. at 615, even though semiautomatic weapons are "the weapons most commonly used today for self-defense," *Caetano v. Massachusetts*, 577 U.S. 411, 417-18 (2016) (Alito, J., concurring in the judgment). *Accord Snope v. Brown*, 145 S.Ct. 1534, 1534 (2025) (Kavanaugh, J., respecting the denial of certiorari) (noting that "most handguns" today "are semi-automatic"). And it would not stop with semiautomatic weapons. If Maryland can ban cruciform-trigger handguns because criminals can use household tools to modify them into uncommon and unlawful guns, then Maryland could ban hunting rifles and shotguns for the same reason: Criminals have been using hacksaws to turn them into illegal short-barreled firearms since long before the days of Bonnie and Clyde. In short, if Maryland can ban cruciform-trigger handguns because of the mere potential to convert them into something illegal, then it is difficult

to see what class of firearm it could not ban.

5. None of that is consistent with the Second Amendment. To be sure, states have broad authority to regulate "dangerous and unusual weapons," *Heller*, 554 U.S. at 627, which is why they may ban the relatively small number of handguns that have been unlawfully converted into fully automatic firearms. But if a firearm is "in common use at the time," then it is plainly not "highly unusual in society at large." *Bruen*, 597 U.S. at 47. And the mere fact that a firearm that is typically possessed by law-abiding citizens for lawful purposes can be altered to *become* dangerous and unusual does not make the *unaltered* firearm less commonly used for lawful purposes. As a court recently explained in enjoining a similar Connecticut law, "there is no dispute that handguns with a cruciform trigger bar (in an unconverted state) are not only safe, but extremely popular for purposes of self-defense, and their possession and carry rights are protected by the Second Amendment." *Glock, Inc., v. Griffin*, 2026 WL 2938741, at *5 (D. Conn. Sept. 30, 2026).

6. It has always been easy for landowners to convert common firearms into dangerous and unusual booby traps to ambush intruders, or for criminals to saw off the barrels of common shotguns and rifles to turn them into dangerous and unusual short-barreled firearms. But our Nation's tradition has always been one of criminalizing the modification and prosecuting the modifiers, not taking the unmodified firearm away from those who seek to keep and bear it for lawful purposes. That was true at the Founding, and it remains true today. *Compare, e.g.*, 1771 N.J. Laws 346, §10 (prohibiting the "most dangerous" practice of setting guns to discharge by "string, rope or other contrivance" and requiring "such person or persons [to] forfeit and [either] pay the sum of six pounds" or "be committed to the common gaol of the county[] for six months"), *with, e.g.*, 21 U.S.C. §841(d) (similar).

7. Just so here. Maryland may ban the parts used to interfere with a cruciform-trigger handgun's intended semiautomatic functioning. In fact, it already has. *See* Md. Code Ann., Crim. Law §§4-301(q), 4-305.1(a)(2). It may aggressively prosecute both those who do the illicit modifying and those who supply the illicit parts to aid it. And it may mobilize all manner of resources to educate the public about this important public-safety issue. But it cannot drive "an entire class of 'arms' that is overwhelmingly chosen by American society for [a] lawful purpose" off the market. *Heller*, 554 U.S. at 628. *Heller* was clear: It is not "permissible to ban the possession of handguns so long as the possession of other firearms … is allowed." *Id.* at 629.

8. SB334 is incompatible with our Nation's historical tradition of firearm regulation. The Court should declare it unconstitutional and enter an order preliminarily and permanently enjoining its implementation and enforcement.

## PARTIES

9. Plaintiff **NSSF** is a non-profit, tax-exempt, non-stock corporation with its principal place of business in Shelton, Connecticut. It serves as the leading trade association for the firearm, ammunition, and hunting and shooting sports industries, with a membership of approximately 10,000 that includes manufacturers, distributors, and retailers of firearms, ammunition, and related products, including manufacturers, distributors, and retailers based in Maryland. NSSF's mission is to promote, protect, and preserve hunting and shooting sports by addressing industry challenges; to advance participation in and understanding of hunting and shooting sports; to reaffirm and strengthen its members' commitment to the safe and responsible sale and use of their products; and to promote support for America's traditional hunting and shooting heritage and firearm freedoms.

10. NSSF is also a committed law-enforcement partner. For decades, it has collaborated with the federal Bureau of Alcohol, Tobacco, Firearms and Explosives ("ATF") on an

anti-straw-purchasing campaign known as "Don't Lie for the Other Guy." *See NSSF, ATF Celebrate 25 Years of Partnership*, NSSF (Sept. 15, 2025), https://perma.cc/WYS9-FYN8. It also partners with ATF to deter and prevent "smash-and-grab" burglaries and robberies of firearm retailers through a program known as "Operation Secure Store." *See Operation Secure Store*, NSSF (2026), https://perma.cc/ZV4A-3PKF. And in response to "increasing numbers of illegal [machinegun conversion devices] recovered at crime scenes," NSSF has launched and devoted money, manpower, and other resources to its "Right Side of Legal" educational campaign, warning firearm owners that "[m]odifying a firearm by adding an illegal device that overrides the original, intended function or design to render a semiautomatic firearm into an automatic firearm is a felony." *See Right Side of Legal*, NSSF (2026), https://perma.cc/D4RU-BPRR ("Illegally modify a gun, face the time: Full auto means full consequences.").

11. Glock, Shadow Systems, Ruger, Derya, PSA, and Fred's Outdoors are all NSSF members. NSSF's membership also includes several other manufacturers who specialize in manufacturing and designing cruciform-trigger handguns, including Beretta (through its affiliate Stoeger). All of these manufacturers make a substantial number of cruciform-trigger handguns for sale throughout the Nation each year, including to customers in Maryland.

12. Plaintiff **Glock** is the U.S. manufacturer of GLOCK pistols and the exclusive importer of GLOCK pistols manufactured in Austria by Glock Ges.m.b.H. All GLOCK pistols use a cruciform trigger bar. As of August 2026, there are 659 federal firearms licensees ("FFLs") in Maryland, all of whom are currently able to purchase GLOCK pistols and import them into the state for purposes of resale. Fifty-three of the FFLs in Maryland participate in the Glock Stocking Dealer program and have contracts with Glock that require them to purchase and stock GLOCK pistols for resale to consumers. Laws banning cruciform-trigger handguns represent an existential

threat to Glock's business.

13. Plaintiff **Shadow Systems** is a firearms manufacturer headquartered in Plano, Texas. Shadow Systems designs and manufactures its semiautomatic handguns at its own facility there and is one of the few firearms manufacturers offering handguns made entirely in the United States. Its handguns are distributed nationwide through established firearms distributors and dealers. Its products are sold to civilian customers and law enforcement agencies, and its handguns are approved for duty use and/or purchased by more than 350 law enforcement agencies. The company's principal product line consists of semiautomatic pistols utilizing cruciform trigger bars, which account for the substantial majority of its sales. Although Shadow Systems has expanded into rifles and firearm accessory products, handgun manufacturing remains its primary business.

14. From 2021 through October 2026, Shadow Systems shipped more than $227 million of product to retailers nationwide—the overwhelming majority of which was cruciform-trigger handguns. Over the same period, it sold more than $363,000 of cruciform-trigger handguns into Maryland, averaging more than $62,000 of Maryland sales annually.

15. Laws banning cruciform-trigger handguns represent an existential threat to Shadow Systems' business. One of the few analogs for SB334 is a 2025 California law that likewise sought to ban most new cruciform-trigger handguns—though, to California's minimal credit, its law did not sweep nearly as far as SB334. *Cf.* Cal. Penal Code §27595(a) (citing Cal. Penal Code §16885). Nonetheless, California's law was enough to drive Shadow Systems from the Golden State entirely—a loss of nearly $3.8 million of annual revenue, and 11% of Shadow Systems' overall business.

16. Plaintiff **Ruger** is one of the country's largest firearms manufacturers. Founded in 1949 in a small red barn in Southport, Connecticut, Ruger has expanded from its humble

beginnings to be one of the country's most trusted firearm brands. Ruger has spent over 75 years earning its reputation as "Arms Makers for Responsible Citizens" by manufacturing American-made lawful products intended for law-abiding consumers.

17. Ruger sells its product via a two-tiered distribution model, meaning that it sells firearms destined for the commercial market to independent, federally licensed wholesale distributors who, in turn, sell Ruger products to independent, federally licensed retailers nationwide. Although Ruger does not have visibility into the ultimate location of sale of its products, knowing its appeal to Maryland consumers, Ruger submitted its RXM pistol, which is equipped with a cruciform trigger, for inclusion on the Maryland Handgun Roster. The Maryland Handgun Roster Board, who is charged with compiling and maintaining a roster of authorized handguns that are useful for legitimate sporting, self-protection, or law enforcement purposes, approved the RXM pistol and placed it on the Roster.

18. Laws banning cruciform-trigger handguns represent a threat to Ruger's business. Since its introduction to the market, the RXM pistol has comprised roughly 5% of Ruger's overall sales, and its prohibition in Maryland will negatively impact Ruger's sales.

19. Plaintiff **Derya** is the U.S. operating company of one of the world's larger manufacturers of shotguns, rifles, and handguns. It was incorporated in Florida in 2024 and began selling firearms to U.S. consumers in January 2025. Derya's product line includes two cruciform-trigger handguns: the DY9 (which is manufactured in Jacksonville) and DY9Z, striker-fired 9mm pistols. These pistols are, by a wide margin, Derya's best-selling products.

20. From January 2025 through October 2026, Derya sold and shipped more than $22 million of product to its distributors and retail customers nationwide. Approximately 57% of that amount—more than $12 million—represents sales of the DY9 and DY9Z cruciform-trigger

handguns. Derya's U.S. business has grown rapidly: nearly $6 million in sales in 2025, Derya's first year, and nearly $17 million in the first ten months of 2026.

21. State laws banning cruciform-trigger handguns represent a grave threat to Derya's business. When SB334 takes effect on January 1, 2027, every Derya cruciform-trigger handgun on Maryland dealers' shelves, and every DY9 and DY9Z in distributor inventory, will become unsellable in Maryland, and Derya will lose the Maryland market for its two best-selling products entirely.

22. Derya's experience in California demonstrates the threat SB334 poses to Derya's business. After California passed a law similar to SB334, Derya lost millions of dollars in sales to California dealers. Derya anticipates similar effects from SB334.

23. Plaintiff **PSA** was founded in 2008 by military veteran Jamin McCallum and is one of the leading firearms and firearms-component manufacturers and retailers in the United States. PSA's mission is to make affordable, high-quality firearms available to as many law-abiding Americans as possible. Consistent with that mission, PSA develops and sells firearms for hunting, self-defense, and recreational shooting, and it has long stood with its customers in defense of the Second Amendment. PSA currently manufactures more than 20 firearm models, including handguns, rifles, and shotguns. It began manufacturing and selling its own handguns with cruciform triggers in 2021 and has now sold over $90 million of PSA-manufactured cruciform-trigger handguns to consumers nationwide. During that same period, PSA sold over $420,000 of PSA-manufactured cruciform-trigger handguns to consumers in Maryland, averaging over $6,000 of Maryland sales monthly.

24. PSA is also a retailer of firearms, firearms components, and related firearm and outdoor products. It sells PSA-manufactured products and products made by other companies

directly to consumers through both its retail stores and its website. When a customer purchases a firearm through the website, PSA ships it to a federally licensed firearms dealer in their state of residence for completion of the applicable background-check and transfer process. From 2021 through last month, PSA sold over $70 million of cruciform-trigger handguns made by other manufacturers to consumers nationwide, including Glock, Shadow Systems, Derya, and Ruger. Over that same period, PSA sold over $525,000 of cruciform-trigger handguns made by other manufacturers to consumers in Maryland, averaging over $7,500 of Maryland sales monthly.

25. State laws banning cruciform-trigger handguns represent a significant threat to PSA's business.

26. Plaintiff **Fred's Outdoors** is a family-owned business founded in 1977 and located in Waldorf, Maryland. Fred's Outdoors has an indoor firearms range, indoor archery range, classroom, and retail showroom. It routinely offers its classroom and range to Department of Natural Resources instructors to teach and certify Hunter Safety Education to young and new hunters, and it also offers training for Handgun Qualification Licensing and Wear and Carry Licensing.

27. Fred's Outdoors customers include, among many others, federal employees, veterans, law enforcement, and security officers who are particularly drawn to Fred's Outdoors because it is located just 15 miles from Washington D.C. and is close to several bases. As an NSSF member, Fred's Outdoors also participates in NSSF's "Don't Lie for the Other Guy" initiative to combat illegal straw purchasing, as well as NSSF's biennial safe firearm storage initiative. And it frequently sells firearms, ammunition, and accessories to various law-enforcement officers for on- and off-duty use.

28. As a retailer, Fred's Outdoors is committed to doing business in an ethical and

professional manner. Its employees are instructed to get to know their customers and to ensure that they are selling the right guns to the right people—especially when they know or suspect that a customer is buying his or her first firearm. This includes asking the customer about his or her intended use of the firearm, reviewing basic firearm safety, and going over proper firearm use, from loading and unloading to disassembly and cleaning. Fred's Outdoors employees also frequently recommend customers take a firearms safety course for further safety instruction and skill development. During these conversations, Fred's Outdoors employees are not only getting to know their customers, but also evaluating their maturity and state of mind to assess whether they are likely to abuse the firearm (and/or whether they are a potential straw purchaser). And at the risk of stating the obvious, Fred's Outdoors never sells a firearm to a customer without conducting any and every background check required by law.

29. A substantial portion of Fred's Outdoors' retail business comprises sales of cruciform-trigger handguns. Since 2022, Fred's Outdoors has sold on average approximately 3,197 cruciform-trigger handguns manufactured by Glock and 121 cruciform-trigger handguns manufactured by Shadow Systems. Fred's Outdoors also began selling cruciform-trigger handguns manufactured by Ruger in 2025, and over that period, it has sold on average approximately 33 cruciform-trigger handguns manufactured by Ruger annually. Fred's Outdoors also sells cruciform-trigger handguns manufactured by other companies on consignment, including, since 2022, at least 30 cruciform-trigger handguns manufactured by PSA. In total, Fred's Outdoors' revenue attributable to cruciform-trigger handguns over the past five years exceeds $2,164,359—an annual average of roughly $375,000. Depending on the year, that represents between 7% and 10% of Fred's Outdoors' annual revenue for a given year.

30. As those values suggest, cruciform-trigger handguns are extremely popular among

Fred's Outdoors' customers seeking arms for self-defense and lawful recreation—especially customers with concealed-carry permits seeking a handgun that is safe to carry on their person. SB334 thus represents a significant threat to Fred's Outdoors' business.

31. Defendant **Anthony G. Brown** is the Attorney General of Maryland and the chief law enforcement officer of the State of Maryland. Attorney General Brown has the power to "[i]nvestigate, commence, and prosecute … any civil or criminal suit or action." Md. Const. art. V, §3(a)(2). Attorney General Brown is a resident of Maryland, and his principal place of business is in Baltimore. At all relevant times, Attorney General Brown, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Attorney General Brown in his official capacity.

32. Defendant **Michael A. Jackson** is the Secretary of the Maryland Department of State Police. As Secretary of the Department of State Police, Defendant Jackson is responsible for "enforc[ing] the laws and ordinances of the State, counties, and municipal corporations." Md. Code Ann., Public Safety §2-301(a)(2)(iii). Defendant Jackson is also responsible for "adopt[ing] regulations to implement [SB334], including publishing a list of prohibited machine gun convertible pistols." Md. Code Ann., Crim. Law §4-305.2(b). At all relevant times, Defendant Jackson, as well as those subject to his supervision, direction, or control, act under color of state law. Plaintiffs sue Defendant Jackson in his official capacity.

## JURISDICTION AND VENUE

33. This Court has subject-matter jurisdiction under 28 U.S.C. §§1331 and 1343 because Plaintiffs allege that SB334 violates the U.S. Constitution and seek relief under 42 U.S.C. §1983.

34. Venue is proper in this District under 28 U.S.C. §1391 because Defendants reside here as a matter of law, and because a substantial part of the events or omissions giving rise to the

claim occurred here.

## BACKGROUND

### I. Cruciform-Trigger Handguns Are "America's Gun."

35. It is hard to overstate the impact that Austrian inventor Gaston Glock had on the handgun market when he unveiled the cruciform-trigger design in 1982. As one rival manufacturer put it, Glock's design "became the next generation of how the entire world makes handguns": "Every single manufacturer from the pre-Glock era now makes a post-Glock era [cruciform-trigger] handgun." Frank Koppenhagen et al., *The Genesis of the Glock Pistol: How Gaston Glock Created the Dominant Design for Handguns* 1-2 (2025), https://perma.cc/7YEJ-YJTQ.

36. Although Glock had no training in firearm design, he was able to resolve a contradiction that had confounded other manufacturers: how to "combin[e] the firepower and rapid reload capability of" many "semiautomatic pistols" with "the safety and operational simplicity of" the leading "double-action revolvers" of the day. *Id.* at 2, 5, 24-25; *see also* CBS News, *How Glock Became America's Gun* (Sept. 15, 2013), https://perma.cc/6EXT-YBH6 [hereinafter *America's Gun*]. At the time, double-action revolvers—so-named because a single pull of the trigger not only fires a round but also rotates the cylinder—typically held only six cartridges and took significant time to reload. They had "a long, heavy trigger pull" that was a mixed blessing: It "ma[d]e[] it virtually impossible to accidentally discharge the gun," but also "ma[d]e[] rapid and precise shooting more challenging" in self-defense situations. Koppenhagen et al., *supra*, at 5-6. By contrast, the then-predominant semiautomatic pistols used a "double-action/single-action" design: "The first shot, fired in double-action mode, require[d] a longer and heavier trigger pull, as the trigger must both cock and release the hammer. All subsequent shots [we]re fired in single-action mode," with "a shorter and lighter trigger pull." *Id.* at 6. Although those double-action/single-action semiautomatic pistols held significantly more cartridges than

double-action revolvers, the “transition between different trigger pull weights” “negatively impact[ed] accuracy and shot consistency,” and the design “required” “additional operating steps” that “complicate[d] the safe operation of the gun and pose[d] potential sources of operating errors, particularly in high stress conditions.” *Id.*

37. Glock’s revolutionary design resulted in “a pistol that, once chambered, remains both ready to fire and safe to carry at all times, with a consistent trigger pull optimized for both safety and performance.” *Id.* at 5. The key innovation was the so-called cruciform “trigger bar capable of movement in two non-parallel directions,” a capability that enables it to “perform[] three functions that were traditionally carried out by separate components” in prior handgun designs. *Id.* at 9, 12; *see also id.* at 13-17 (explaining the more technical aspects of the mechanics); Matt Rittman, *How a Glock Works* (July 2, 2019), https://bit.ly/4wHWaOi. Because the cruciform design allows for “stamp[ing]” instead of “machin[ing],” it is also more “cost-effective” to “mass produc[e].” Koppenhagen et al., *supra*, at 20-21. As Glock put it in his original U.S. patent:

> Handling of the pistol according to the instant invention is therefore as simple as possible. The pistol is ready after chambering of the cartridge in the barrel for shooting at any time and is nonetheless completely safe from unintentional shots. Similarly in this condition the pistol is fully drop- and jar-resistant. As a result of the unchanging trigger force accuracy is increased. Simple and safe handling of the pistol is ensured even for the unpracticed user.

*Id.* at 9; *see id.* at 18 (schematic comparing operational steps for Glock versus other common firearm designs). And with “significantly fewer parts” “than all competing products at the time,” the cruciform-trigger pistol is “significantly simpl[er]” to maintain” and “demonstrate[d] … significantly higher” “reliability.” *Id.* at 21; *see also* CBS, *America’s Gun*, *supra* (observing that cruciform-trigger handguns have “only 34 components—about half of most other makers,” “ma[king] the gun easier to manufacture, and less likely to malfunction”).

38. The cruciform-trigger design also allows for three sequential passive safeties, each

operating independently—a groundbreaking advancement when it comes to preventing accidental discharges:




GLOCK, *Our Safe Action® System* (2026), https://perma.cc/4GZG-DPMQ (red annotation added). *First*, a safety lever integrated into the trigger blocks unintentional "rearward movement of the trigger":




Koppenhagen et al., *supra*, at 13-15. *Second*, the design of the cruciform trigger bar makes it physically impossible for the firing pin to strike the cartridge unless and until the shooter actuates the cruciform trigger bar by pulling the trigger:




*Id.* at 15. *Third*, the design of the cruciform-trigger bar makes it impossible for the firing pin to release without the shooter actuating the cruciform trigger bar:




*Id.* at 14. *See generally* Rittman, *supra*. The cruciform trigger bar's innovative design is what makes it possible to combine these redundant safeties into one integrated component, rather than relying on multiple subcomponents to work together in ways that make the firearm more susceptible to component failure or manufacturing defects.

39. That "unique balance" of safety, "performance[,] and value" has made cruciform-trigger handguns "wide[ly] popular[]" for countless "armed citizens, competition shooters, collectors, and general firearms enthusiasts." Kyle Clouse, *Is Glock Still the King of Semi-Auto Pistols?*, Liberty Safe (Jun. 13, 2025) https://perma.cc/TV8E-HZJ7; *see also* CBS, *America's Gun*,

*supra* (deeming cruciform-trigger handguns "a lawnmower as far as reliability goes"). Firearms produced by Glock's eponymous company alone have consistently accounted for up to "65% market share of the handguns in the U.S." Forbes, *Gaston Glock & Family* (2026), https://perma.cc/AV67-93M4; *see* Clouse, *supra* ("[M]ore Glock pistols have been sold than any other handgun ever made, with recent estimates numbering total Glock sales topping the 20 million mark globally."). And now that the patent on Glock's cruciform-trigger bar has expired, an entire industry of manufacturers has cropped up "mak[ing] their own versions of Glock pistols," Clouse, *supra*, i.e., their own version of cruciform-trigger pistols.

40. Shadow Systems, Ruger, Derya, and PSA are all manufacturers who produce pistols with the same basic cruciform-trigger design as Glock. Indeed, both Ruger and Shadow Systems have been recognized as "American companies that make outstanding Glock clones." Brad Fitzpatrick, *Top Glock Clones U.S. Buyers Are Raving About* (Mar. 12, 2026), https://perma.cc/4V65-Y6Y4 (describing the Shadow Systems MR920 as "certainly one of the best in its class" and the Ruger RXM as a "real winner"); *see also* Paul Peterson, *7 Best Glock Clones for Any Budget: Buyer's Guide*, Guns.Com (Feb. 20, 2025), https://perma.cc/DK5C-NN2U (identifying both Ruger and Shadow Systems as producing some of the "best Glock Clones"). As those market-leading reviews suggest, these manufacturers' guns are popular with, and commonly used by, law-abiding citizens both in and out of Maryland, as their sales figures corroborate. *See supra* ¶¶14, 20, 23, 29.

41. As a class, well over 500,000 cruciform-trigger handguns are manufactured for sale in the United States annually. *See, e.g.*, ATF, *Annual Firearms Manufacturing & Export Report* 15, 51, 201-02 (2024), https://perma.cc/ZCU6-WWR2. By any measure, and as the federal government has acknowledged across multiple administrations, cruciform-trigger handguns are

"popular for civilian use." 87 Fed. Reg. 24,652, 24,655 (Apr. 26, 2022). Indeed, the Fourth Circuit itself has explicitly characterized the Glock 19—a cruciform-trigger handgun—as a "commonly used handgun." *See Bianchi v. Brown*, 111 F.4th 438, 455 (4th Cir. 2024) (en banc); *id.* at 527 (Richardson, J., dissenting) (similar).

42. While safety, reliability, and affordability help explain why cruciform-trigger handguns have become the handgun of choice for law-abiding citizens, they are decidedly *not* the firearm of choice for criminals. Quite the contrary: ATF data tracking "weapons recovered at crime scenes" dispels any suggestion that cruciform-trigger handguns are "distinctively used" by criminals "more than other guns." CBS, *America's Gun*, *supra* ("The notion that every gangster in every city is walking around with a Glock just isn't true.").

43. That said, "one of the most prominent emerging public and law enforcement officer safety threats in recent years has been the proliferation of illegal" machine gun conversion devices ("MCDs"). *Right Side of Legal*, *supra*. "MCDs include traditional 'Drop in Auto Sears,' which are designed for use on AR-type firearms," *id.*—i.e., "the most popular rifle in the country" among law-abiding citizens, *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 605 U.S. 280, 297 (2025). MCDs also include "more recently developed 'switches,' which are designed for use on" cruciform-trigger handguns. *Right Side of Legal*, *supra*; *see* ATF, *Machinegun Conversion Devices: Fact Sheet* (Dec. 12, 2024), https://perma.cc/LD8J-GRB4.

44. For decades, lawmakers have responded to the threat of MCDs by criminalizing the MCDs themselves, as well as firearms equipped with them. Federal law, for instance, criminalizes "machinegun" possession, *see* 18 U.S.C. §922(o), and defines "machinegun" as "any" fully automatic weapon, as well as "any part designed and intended … for use in converting a weapon into a machinegun," 26 U.S.C. §5845. Maryland law likewise criminalizes possession of any

"rapid fire activator," Md. Code Ann., Crim. Law §4-305.1(a)(2), which is defined to include "any device, including a removable manual or power-driven activating device, constructed so that, when installed in or attached to a firearm: the rate at which the trigger is activated increases; or the rate of fire increases," *id.* §4-301(q).

45. But as the Supreme Court noted in *Staples v. United States*—itself a case about an AR-15 that had been illegally modified to fire fully automatically—unmodified semiautomatic firearms have always remained "lawful" to "possess[]." 511 U.S. at 612.

## II. SB334 Bans Sales Of New Cruciform-Trigger Handguns After January 1, 2027.

46. SB334 breaks from that longstanding tradition, "prohibiting the sale and transfer of pistols with a cruciform trigger bar." Press Release of Attorney General Brown, *Attorney General Brown on Court Ruling Keeping Maryland's Law on Machine Gun Convertible Pistols in Place*, (Sep. 25, 2026), https://perma.cc/3WFB-EJ54. Effective January 1, 2027, SB334 makes it illegal for any person to "manufacture, sell, offer for sale, purchase, receive, or transfer a machine gun convertible pistol." Md. Code Ann., Crim. Law §4-305.2(a). Violating that prohibition is punishable by up to three years in prison and a fine of up to $5,000. *Id.* §4-306(a).

47. SB334 defines "machine gun convertible pistol" as "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or by using common household tools into a machine gun by the installation or attachment of a pistol converter as a replacement for the slide's backplate." *Id.* §4-301(o)(1). A "pistol converter" is in turn defined as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate and interferes with the trigger mechanism, which enables the pistol to shoot automatically more than one shot by a single function of the trigger," including one "manufactured using a three-dimensional printer." *Id.* §4-301(p).

48. SB334 directs the Department of State Police to "adopt regulations to implement"

its requirements, including by "publishing a list of prohibited machine gun convertible pistols." *Id.* §4-305.2(B). While the Department has yet to publish that list, the only way for a cruciform-trigger handgun to fall outside SB334's definition of "machine gun convertible pistol" is if it has "a tab or other piece of material … located on the rear portion of the pistol frame to block the attachment of a pistol converter" and that "tab or other piece of material" cannot be "readily removed with a common household tool." *Id.* §4-301(o)(2).

49. Despite multiple requests, Maryland has refused to take a position on whether the popular cruciform-trigger handguns made by Plaintiffs fall outside SB334's definition of "machine gun convertible pistol." Instead, the state has simply stated that it anticipates publishing its list of prohibited pistols sometime in December—which, at best, is mere weeks before SB334 is set to take effect on January 1, 2027. Several Plaintiffs, including Glock and Derya, have put significant time and resources into researching and implementing design changes intended to inhibit the installation of an MCD. But when asked directly by Plaintiffs, Maryland has refused to say whether these design changes are sufficient to comply with SB334. Other Plaintiffs, including Shadow Systems, are also currently in the process of engineering a commercially viable solution that would frustrate criminals bent on using MCDs. But even in the best-case scenario, any solution that may be developed by Shadow Systems remains months away—and of course, Maryland's refusal to take a position on the sufficiency of the design changes already implemented by Glock and Derya make it exceedingly difficult for them and other manufacturers to know whether their resource-intensive efforts will meaningfully accomplish their goal of complying with SB334.

50. Indeed, there is no guarantee that Maryland will deem manufacturers' efforts enough. At bottom, no amount of design alteration can ever make a handgun impervious to

criminal misuse, or change the reality that "virtually any semiautomatic weapon may be converted" "into a machinegun" by someone set on committing that crime. *Staples*, 511 U.S. at 615. The same (il)logic underlying SB334 could thus be invoked to ban semiautomatic firearms entirely.

## III. Banning Sales Of Firearms In Common Use For Lawful Purposes Is Inconsistent With Historical Tradition And Therefore Violates The Second Amendment.

51. The Supreme Court has held multiple times that states may not ban arms that "law-abiding citizens" "typically possess[] … for lawful purposes." *Heller*, 554 U.S. at 625, *accord Bruen*, 597 U.S. at 21 ("[T]he Second Amendment protects the possession and use of weapons that are 'in common use at the time.'"). That describes SB334 to a T: In purpose and effect, it is designed to prohibit "law-abiding citizens from purchasing" the single most common class of handguns—indeed, one of the most common firearms—on the market, thereby "substantially burdening the [citizens'] rights." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 417 (4th Cir.), *vacated on other grounds*, 14 F.4th 322 (4th Cir. 2021); *see also Gazzola v. Hochul*, 88 F.4th 186, 196 (2d Cir. 2023) (per curiam) (holding that "commercial regulations on firearms dealers, whose services are necessary to a citizen's effective exercise of Second Amendment rights, cannot have the effect of eliminating the ability of law-abiding, responsible citizens to acquire firearms"); *see* Press Release of Attorney General Brown, *supra*.

52. Whatever room for debate there may be about what exactly suffices to render a class of firearms in common use, there can be no serious dispute that cruciform-trigger handguns are typically possessed by a substantial number of law-abiding citizens for self-defense, both inside and outside Maryland. That makes SB334 unconstitutional, full stop. When it comes to what "Arms" "the people" have a "right" "to keep and bear," U.S. Const. amend. II, common use *is* the controlling test—and SB334 flunks it.

53. That these ubiquitous semiautomatic handguns can be converted into fully automatic firearms does not change the calculus. Modern firearm restrictions are permissible only if they are consistent with "the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 597 U.S. at 19. SB334 is not. For as long as firearms have existed, criminals unfortunately have attempted dangerous firearm conversions. Yet SB334's response to that age-old problem departs starkly from the traditional way our Nation has dealt with it—which is by banning the conversion, not the convertible firearm.

54. For instance, criminals have always been able to convert common firearms into dangerous and unusual booby traps. The tradition at the Founding was to criminalize these so-called trap guns but to leave the unmodified gun legal to purchase and possess. *See, e.g.*, 1771 N.J. Laws 346, §10. That remained the tradition when the states ratified the Fourteenth Amendment. *See, e.g.*, 1884 Vt. Acts & Resolves 74, §1. And it remains the tradition today. *See, e.g.*, 21 U.S.C. §841(d).

55. Criminals have likewise always been able to convert long guns commonly used for hunting and other lawful purposes into dangerous and uncommon short-barreled rifles and shotguns. But here, too, the unbroken tradition has been to criminalize the sawed-off variants (and prosecute those doing the sawing) but leave the unmodified rifles and shotguns lawful to purchase and possess. *See, e.g.*, 18 U.S.C. §922(a)(4), (b)(4); Md. Code Ann., Public Safety §5-203.

56. More recently, criminals have devised no shortage of ways to turn common semiautomatic firearms into illegal machine guns, from "fil[ing] away" internal safeguards (as in *Staples*, 511 U.S. at 603) to simply tying a shoelace "to the cocking handle of a semiautomatic rifle" (as described in, *e.g.*, Letter from Richard Vasquez, Acting Chief, Firearms Technology Branch, ATF, to Brian A. Blakely (June 25, 2007), https://perma.cc/22Q7-7C94). Once again, the

modern response reflects the Founding-era tradition: Ban the modification and the modified firearm, but leave the unmodified firearm legal to purchase and possess.

57. As this history shows, the problem of converting safe firearms into dangerous ones "has persisted since the 18th century"—yet "the lack of a distinctly similar historical regulation addressing that problem is relevant evidence that [SB334] is inconsistent with the Second Amendment." *Bruen*, 597 U.S. at 26. As one court recently concluded in considering Connecticut's parallel law, what matters under our Nation's historical tradition is whether the firearm is "unsafe *at the point of sale*." *Glock*, 2026 WL 2938741, at *5. And "there is no dispute that handguns with a cruciform trigger bar (in an unconverted state) are not only safe, but extremely popular for purposes of self-defense, and their possession and carry rights are protected by the Second Amendment." *Id.*

58. While another district court in Maryland recently reached the opposite conclusion, it failed to follow the Supreme Court's admonition that a law implicating the Second Amendment's plain text is "presumptively unconstitutional," *Wolford v. Lopez*, 609 U.S. 185, 205 (2026); *contra Bathras v. Moore*, 2026 WL 2982218, *14 (D. Md. Oct. 5, 2026). It also mistakenly relied on historical laws against rioting, preventing the aggregation of gunpowder, and banning uncommonly dangerous weapons used primarily by criminals like machineguns and short-barreled rifles or shotguns. *See Bathras*, 2026 WL 2982218, at *16-18. But those laws all prohibited the dangerous activity and uncommonly dangerous weapons *themselves*; they did not prohibit safe and popular weapons just because they can be converted into something else. The ban on short-barreled shotguns and rifles proves the point. "As shortened barrels became popular with Prohibition-era gangsters … Congress regulated sawed-off shotguns and short-barreled rifles"—but it did not prohibit shotguns and rifles. *Id.* at *18. No court has ever identified a historical

analogue to SB334's complete ban of safe, legal, and popular firearms simply because they can be illegally transformed and misused by criminals.

59. In fact, the history is so one-sided that Plaintiffs would prevail even if they bore the burden to prove that SB334 is *not* consistent with historical tradition, *contra Bruen*, 597 U.S. at 24. The potential for dangerous firearms conversions has always been an unfortunate byproduct of widespread firearm availability, and it was a potential well known to the Founding generation. Yet that generation chose to ratify the Second Amendment regardless—"the very *product* of an interest balancing by the people" that "'surely elevates above all other interests the right of law-abiding, responsible citizens to use arms' for self-defense." *Id.* at 26. It is not for Maryland to "conduct" that balancing "anew" today. *Heller*, 554 U.S. at 635.

## CLAIM FOR RELIEF

### Violation of U.S. Constitution, Second Amendment
### 42 U.S.C. §1983

60. Plaintiffs re-allege and incorporate by reference the preceding paragraphs as though fully set out herein.

61. The Second Amendment says: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

62. As relevant here, SB334 defines "machine gun convertible pistol" as "any semiautomatic pistol with a cruciform trigger bar that can be readily converted by hand or by using common household tools into a machine gun by the installation or attachment of a pistol converter as a replacement for the slide's backplate." Md. Code Ann., Crim. Law §4-301(o)(1). SB334 defines "pistol converter" as "any device or instrument that, when installed in or attached to the rear of the slide of a semiautomatic pistol, replaces the backplate and interferes with the trigger

mechanism, which enables the pistol to shoot automatically more than one shot by a single function of the trigger," including one "manufactured using a three-dimensional printer." *Id.* §4-301(p).

63. So defined, "machine gun convertible pistol[s]" are "Arms" covered by the Second Amendment.

64. So defined, "machine gun convertible pistol[s]" are in common use for self-defense, hunting, target shooting, and other lawful purposes.

65. Because SB334 bans the commercial sale of arms in common use for lawful purposes, it violates the Second Amendment. *See McCoy v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 140 F.4th 568, 575 (4th Cir. 2025) (acknowledging that "purchasing a handgun for lawful purposes—is part of the 'conduct' protected by the Amendment."); *accord, e.g.*, *Ezell v. City of Chicago*, 651 F.3d 684, 704 (7th Cir. 2011) (same); *Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) (same).

66. Glock, Shadow Systems, Ruger, Derya, PSA, and other NSSF members have long been manufacturing handguns that SB334 bans; Fred's Outdoors and other NSSF members have long been lawfully selling them; and all would like to continue to engage in that presently lawful conduct. And the customers that these and other NSSF members would like to continue to be able to lawfully serve are among "the people" the Second Amendment protects.

67. Glock, Shadow Systems, Ruger, Derya, PSA, and Fred's Outdoors therefore have standing to challenge SB334 in their own right. *See Maryland Shall Issue, Inc. v. Hogan*, 971 F.3d 199, 216 (4th Cir. 2020) (holding that, with respect to laws regulating the sale of firearms, a "vendor has third-party standing to pursue claims on behalf of its customers, regardless of whether a vendor's customers are hindered in bringing their own claims"). NSSF likewise has standing, both in its own right as well as on behalf of its members. *See Havens Realty Corp. v. Coleman*,

455 U.S. 363, 378-79 (1982); *Students for Fair Admission, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 199 (2023) ("Either" an organization "can claim that it suffered an injury in its own right or, alternatively, it can assert 'standing solely as the representative of its members.'"). Among other things, if SB334 is permitted to take effect, NSSF will be forced to divert resources away from other initiatives—including the "Right Side of Legal" campaign described *supra* ¶__—and devote significant resources to educating and supporting its members in efforts to comply with SB334. Compounding the problem, if SB334 is permitted to take effect, NSSF also anticipates a reduction in receivable NSSF membership dues.

**PRAYER FOR RELIEF**

Plaintiffs respectfully request that this Court enter judgment in favor of Plaintiffs and against Defendants and provide the following relief:

1. an order declaring that the challenged portions of SB334 violate the Second Amendment both on their face and as applied to cruciform-trigger handguns manufactured by Glock, Shadow Systems, Ruger, Derya, and PSA, cruciform-trigger handguns sold by Fred's Outdoors, and cruciform-trigger handguns manufactured and/or sold by other NSSF members;

2. an order preliminarily and permanently enjoining Defendants without bond from implementing and enforcing the challenged portions of SB334;

3. an award of costs and attorneys' fees pursuant to 42 U.S.C. §1988 and any other applicable statute or authority; and

4. any further relief the Court deems just and appropriate.

PLAINTIFFS NATIONAL SHOOTING SPORTS FOUNDATION, INC.; GLOCK, INC.; SHADOW SYSTEMS LLC; STURM, RUGER & CO., INC.; SOUTH DERYA CORPORATION d/b/a DERYA USA; PALMETTO STATE ARMORY, LLC; and FRED'S SPORTS & FURNITURE, INC. d/b/a FRED'S OUTDOORS.

By /s/ Andrew Lawrence

Erin E. Murphy (pro hac vice forthcoming)
Matthew D. Rowen (pro hac vice forthcoming)
Andrew Lawrence (MD Bar #1512160036)
Kevin Wynosky (pro hac vice forthcoming)
Ilan J. Posner (pro hac vice forthcoming)
CLEMENT & MURPHY PLLC
706 Duke Street
Alexandria, VA 22314
Telephone: (202) 742-8900
erin.murphy@clementmurphy.com
matthew.rowen@clementmurphy.com
andrew.lawrence@clementmurphy.com
kevin.wynosky@clementmurphy.com
ilan.posner@clementmurphy.com

***Their Attorneys***

Christoper Renzulli (application for admission forthcoming)
Scott C. Allan (application for admission forthcoming)
RENZULLI LAW FIRM, LLP
One North Broadway, Suite 1005
White Plains, NY 10601
Telephone: (914) 285-0700
crenzulli@renzullilaw.com
sallan@renzullilaw.com

***Additional Attorneys for Plaintiff Glock, Inc.***

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Salam Fatohi declares as follows:

1. I am the Director of Research at the National Shooting Sports Foundation.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2026

By: /s/ Salam Fatohi
Salam Fatohi

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. §1746, Richard T.S. Roe declares as follows:

1. I am the Chief Executive Officer of Shadow Systems LLC.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2026

By: /s/ Richard T.S. Roe
Richard T.S. Roe

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Robert Werkmeister declares as follows:

1. I am the Senior Vice President of Marketing for Sturm, Ruger & Co., Inc.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: /s/ Robert Werkmeister_
Robert Werkmeister

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Dustin Jones declares as follows:

1. I am the Vice President of South Derya Corporation, d/b/a Derya USA.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: /s/ Dustin Jones
Dustin Jones

**VERIFICATION OF COMPLAINT**

Pursuant to 28 U.S.C. §1746, Cameron Tapler declares as follows:

1. I am the Director of Branding and Product Management of Palmetto State Armory, LLC.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: /s/ Cameron Tapler
Cameron Tapler

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Joe Herbert declares as follows:

1. I am the owner of Fred's Sports & Furniture, Inc. d/b/a Fred's Outdoors.

2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.

3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 20, 2026

By: /s/ Joe Herbert
Joe Herbert

## VERIFICATION OF COMPLAINT

Pursuant to 28 U.S.C. §1746, Carlos Guevara declares as follows:

1. I am the Co-Chief Executive Officer, General Counsel and Secretary of Glock, Inc.
2. I have read the foregoing complaint and state that the statements therein to which I have personal knowledge are true and correct to the best of my belief.
3. I am competent to testify to the contents therein of which I have personal knowledge.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on November 19, 2026

By: ______________________

Carlos Guevara
CEO, General Counsel and Secretary
Glock, Inc.